JMH:JRS
F. #2023R00145

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 646-941-0241, STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | **TO BE FILED UNDER SEAL**<br><br>**SEARCH WARRANT APPLICATION FOR HISTORICAL CELL SITE INFORMATION**<br><br>Case No. 23-MC-1003 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, MEGAN QUINN, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a cellular telephone assigned call number 646-941-0241 ("the

SUBJECT PHONE"), which is stored at premises controlled by Verizon Wireless ("Verizon"), a

wireless telephone service provider located in Bedminster, New Jersey.  The information to be

searched is described in the following paragraphs and in Attachment A.  This affidavit is made in

support of an application for a search warrant under Title 18, United States Code, Section

2703(c)(1)(A) to require Verizon to disclose to the government copies of the information further

described in Section I of Attachment B.  Upon receipt of the information described in Section I

of Attachment B, government-authorized persons will review the information to locate items

described in Section II of Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") and have been since 2005.  In this capacity, I have participated in the

investigation of numerous cases involving armed robberies and larcenies, including armed robberies and larcenies of businesses, and I have conducted physical and electronic surveillance, interviewed witnesses, participated in the execution of court-authorized search warrants, reviewed electronic evidence, including cell site records, and used other investigative techniques to obtain relevant information regarding these and other crimes. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and therefore does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of, among other laws, Title 18, United States Code, sections 2, 924(c), and 1951(a) (hereinafter, the "SUBJECT OFFENSES") have been committed and that the search of the information described in Attachment A will lead to evidence of these crimes, as further described in Attachment B.

PROBABLE CAUSE

5. The United States, including the ATF and the New York City Police Department ("NYPD"), is conducting an investigation into the armed robbery of a news and tobacco shop (the "Store") located in Brooklyn, New York. On February 10, 2023, at approximately 11:23 p.m., two male suspects entered the Store. One suspect stole approximately $4,615.00 from the cash register while the other suspect pistol-whipped a customer multiple

times before shooting the customer in the hip.  The perpetrators then escaped in a vehicle driven by a third perpetrator.

The February 10, 2023 Armed Robbery and Shooting

6.      On February 10, 2023, at approximately 11:23 p.m., two men wearing face masks and dressed in hooded clothing—one in a blue hooded jacket and the other in what appears to be a black sweatshirt—entered the Store, which is located at 477 Myrtle Avenue in Brooklyn, New York and which engages in interstate commerce.  Video footage from security cameras located inside of the Store captured the two perpetrators as they entered the Store, as set forth in Figure 1 below.



**Figure 1**

7.      Upon entering the Store, the perpetrator wearing the blue hooded jacket (the "Robber") forced his way behind the counter.  While pointing a knife at the cashier, the Robber stole the cashier's wallet and grabbed approximately $4,615.00 in cash from the cash registers, as shown below in Figure 2.

3

**Figure 2**

8.      The perpetrator wearing what appears to be a black hooded sweatshirt (the "Shooter") rushed to the back of the Store, where the Store sells beverages in large, refrigerated coolers.  The Shooter immediately pointed a handgun at a customer (the "Victim") who was standing by the coolers using his cellphone, as seen below in Figure 3.



**Figure 3**

9.      The Shooter pistol-whipped the Victim across the face multiple times and then shot the Victim in the hip.  The Victim immediately collapsed onto the floor, wincing in pain.

10.      Approximately two minutes after entering, the Robber and the Shooter fled the Store.  The Victim was rushed by ambulance to Methodist Hospital for treatment for his significant injuries to his face and hip.

<u>Video Canvas</u>

11.      Law enforcement subsequently conducted a video canvas of the area surrounding the Store.  A surveillance camera located approximately one block north of the Store captured the Robber and the Shooter running from the Store in the minutes after the armed robbery.  They are seen in the footage entering a red-colored sedan (the "Getaway Vehicle") located underneath the Brooklyn-Queens Expressway that appears to have been driven by a third perpetrator (the "Getaway Driver").

12.      Additional surveillance recorded shortly before the armed robbery showed the Getaway Driver pacing in the vicinity of the Getaway Vehicle at the same time that the Robber and the Shooter made their way to the Store.  The Getaway Driver is wearing what appears to be a dark jacket, a blue hooded sweatshirt, and light-colored pants with writing down the leg.  A screenshot from the surveillance video showing the Getaway Driver pacing is set forth below in Figure 4.



**Figure 4**

13.     Law enforcement also determined through a license plate reader affixed to a private residence on Hall Street—which is perpendicular to Myrtle Avenue, where the Store is located—that a red Chevy Malibu with New York license plate number KYM2656 matching the description of the Getaway Vehicle on the surveillance footage drove down that street shortly before the armed robbery took place.  Accordingly, I believe that the red Chevy Malibu was the Getaway Vehicle.

14.     A review of law enforcement databases shows that the Getaway Vehicle is registered to an individual named Khaliaha Kates.

<u>MICHAEL RUTLEDGE</u>

15.     Based on my participation in this investigation, I believe that the Getaway Driver was Michael Rutledge, as set forth in more detail below.  Law enforcement records also show that on February 10, 2023 at approximately 7:28 p.m., approximately four hours before the robbery, NYPD officers had an encounter with the driver of the red Chevy Malibu in Manhattan. The officers observed the driver urinating in public and the passenger smoking marijuana inside of the vehicle.  No arrests were made.

16.     The passenger provided the officers with what appears to be a fictitious name.   However, the driver of the vehicle identified himself to the responding officers as

MICHAEL RUTLEDGE. Body worn camera footage of RUTLEDGE during this police

encounter is seen in Figure 5 below:



**Figure 5**

17.     In the excerpt of the body worn camera footage shown in Figure 5,

MICHAEL RUTLEDGE is wearing what appears to be the same blue hooded sweatshirt and

dark jacket as the Getaway Driver who was captured in the surveillance footage from the vicinity

of the armed robbery set forth in Figure 4:

          

**Figure 4**                    **Figure 5**

18.     While conducting physical surveillance in the days after the armed

robbery, law enforcement discovered the red Chevy Malibu parked in the Bronx. Law

enforcement then conducted a video canvas of the area surrounding where the red Chevy Malibu

was found parked. An individual who appears to be MICHAEL RUTLEDGE is seen on

surveillance at approximately 1:09 a.m. on February 11, 2023—approximately one and a half hours after the armed robbery—in the vicinity of East 149th Street and Concord Avenue in the Bronx.

19.     Specifically, as shown in Figure 6—which is an excerpt from the surveillance video in the vicinity of East 149th Street and Concord Avenue in the Bronx at approximately 1:09 a.m. on February 11, 2023—MICHAEL RUTLEDGE is seen wearing what appears to be the same dark jacket and blue hooded sweatshirt shown in Figure 4 and Figure 5, as well as the same white pants shown in Figure 4.



**Figure 6**

20.     Law enforcement conducted additional physical surveillance on February 17, 2023 of the Getaway Vehicle and observed the person who appears to be MICHAEL RUTLEDGE walk to the vehicle with a person who appears to be Khaliaha Kates, the registered owner of the vehicle. Additional video surveillance reviewed by law enforcement also shows RUTLEDGE walking to the vehicle with Kates.

21.     Law enforcement has reviewed historical cell site data connected to MICHAEL RUTLEDGE's cell phone.[1] RUTLEDGE submitted this phone number to the officer supervising his parole following his conviction for manslaughter in the first degree with intent to cause serious physical injury, in violation of New York Penal Law 125.20. Additionally, RUTLEDGE provided that same phone number when pursuing property/casualty claims connected to several automobile accidents over the past year. Further, a review of subscriber records from T-Mobile confirmed that the phone number was subscribed to by RUTLEDGE in his own name and that it was active both before and after the armed robbery.

22.     As seen in the maps below that display the historical cell site data obtained pursuant to the warrant, MICHAEL RUTLEDGE's phone was in the vicinity of the Store during the armed robbery. Approximately one and a half hours after the armed robbery, RUTLEDGE's phone was also near East 149th Street and Concord Avenue—the same time that RUTLEDGE was seen on surveillance video in that vicinity:



---

[1]     Law enforcement obtained these records pursuant to a search warrant signed by United States Magistrate Judge Vera M. Scanlon on March 14, 2023 under Miscellaneous Docket Number 23-MC-738.



The SUBJECT PHONE

23.     Law enforcement has also reviewed toll records for MICHAEL

RUTLEDGE's phone number—the same phone number for which law enforcement reviewed

historical cell site data.  Prior to the armed robbery on February 10, 2023, RUTLEDGE was in

contact with the phone number for the SUBJECT PHONE five times between 8:59 p.m. and 9:33

p.m.—approximately two hours preceding the armed robbery.

24.     The SUBJECT PHONE is serviced by Verizon.  Subpoena returns from

TracFone, which is a reseller of wireless services and a subsidiary of Verizon, list the subscriber

address for the SUBJECT PHONE as 1041 Pugsley Avenue, Apartment 14G, Bronx, New York.

No name is listed for the subscriber of the SUBJECT PHONE in the subpoena returns, however.

25.     Based on the historical cell site returns for MICHAEL RUTLEDGE's phone number, RUTLEDGE was in the vicinity of 1041 Pugsley Avenue prior to the armed robbery on February 10, 2023 at approximately 9:30 p.m., as shown in the image below:



26.     Further, the toll records for MICHAEL RUTLEDGE show that after RUTLEDGE was at 1041 Pugsley Avenue at approximately 9:33 p.m., there were no additional communications between RUTLEDGE and the SUBJECT PHONE before the armed robbery. This pattern is consistent with RUTLEDGE picking up the user of the SUBJECT PHONE and the two of them being together for the next several hours for purposes of completing the armed robbery. Once they were in close physical proximity, there would be no reason for RUTLEDGE and the SUBJECT PHONE to communicate with one another by telephone.

27.     Based on the historical cell site returns for MICHAEL RUTLEDGE, RUTLEDGE returned to the vicinity of 1041 Pugsley Avenue on February 11, 2023 between approximately 12:50 a.m. and 12:57 a.m., as shown in the image below:



28.     RUTLEDGE's presence near 1041 Pugsley Avenue approximately one hour after the armed robbery is consistent with him dropping off one of the perpetrators at that location after completion of the armed robbery.

29.     In addition, 1041 Pugsley Avenue is approximately 3.4 miles from the vicinity of East 149th Street and Concord Avenue in the Bronx, where MICHAEL RUTLEDGE was observed on surveillance video and his historical cell site location data recorded him as being present at approximately 1:09 a.m. on February 11, 2023. During those early morning hours, it would be feasible for RUTLEDGE to drive the distance between those locations in approximately 12 minutes.

30.     Law enforcement has also reviewed toll records for the SUBJECT PHONE. These toll records show that the SUBJECT PHONE did not place or receive any calls during the time when the robbery was in progress. This pattern is consistent with the fact that,

based on the review of surveillance footage of the robbery and shooting, neither perpetrator appears to place or receive any calls during the robbery and shooting.

31.     Law enforcement has researched the residents of 1041 Pugsley Avenue to determine the user of the SUBJECT PHONE and the individual who MICHAEL RUTLEDGE likely picked up and dropped off from that location.

32.     ANGEL GOMEZ resides at 1041 Pugsley Avenue in Apartment 14B, which is on the same hallway as Apartment 14G, the registered address for the SUBJECT PHONE.

33.     Additionally, ANGEL GOMEZ and MICHAEL RUTLEDGE were previously incarcerated at the same facility. In 2018, GOMEZ was sentenced to two years of incarceration after he was convicted of assault in the second degree with intent to cause serious physical injury. While serving his sentence, GOMEZ was incarcerated at the Wallkill Correctional Facility. MICHAEL RUTLEDGE was also an inmate at that same facility at the same time as GOMEZ while RUTLEDGE was serving his sentence for manslaughter in the first degree with intent to cause serious physical injury.

34.     Law enforcement has reviewed open source information associated with what are believed to be ANGEL GOMEZ's social media accounts. Law enforcement believes that GOMEZ uses the Instagram account "Childofalion__." Law enforcement records indicate that GOMEZ was born on October 21, 1979. On October 21, several followers of the "Childofalion__" account wished the user of that account a happy birthday. Further, the individual who appears in photos posted to this account looks similar to photos of GOMEZ in law enforcement records. In particular, GOMEZ has a unique tattoo on the ring finger of his left hand. In his mug shot, GOMEZ displayed this tattoo, as seen in the photograph below. A tattoo

on the ring finger of the left hand is also visible in posts by the user of the "Childofalion__"

Instagram account, as seen below:



35.       Multiple posts on the "Childofalion__" Instagram account reference that

the user of the account also maintains a TikTok account with the username "@NewYorkVillain."

TikTok is a social media platform on which users post short video clips. The accountholder of

this TikTok account appears physically similar to photos of ANGEL GOMEZ in law

enforcement records. Additionally, approximately four days before the armed robbery, on

February 6, 2023, GOMEZ posted a video on TikTok in which he is wearing blue shoes with a

white sole and white diagonal stripe, as seen below:



36.     In this excerpt of the TikTok video, ANGEL GOMEZ appears to be wearing sneakers consistent in appearance with the sneakers worn by the Shooter, as seen in the surveillance image excerpted below:



37.     In addition, law enforcement records reflect that ANGEL GOMEZ's height is approximately five foot, seven inches, which is consistent with the physical description provided by witnesses in the Store, and seen by law enforcement in surveillance footage, of the Shooter. The Shooter was described as a short male of average build, similar to GOMEZ.

38.     Based on the foregoing, there is probable cause to believe the SUBJECT PHONE's historical cell site location data for the period from February 9, 2023 at 12:00 a.m. Eastern to February 12, 2023 at 12:00 a.m. Eastern constitutes evidence of the SUBJECT OFFENSES and will assist law enforcement in confirming the locations of the user of the SUBJECT PHONE, i.e., ANGEL GOMEZ.

39.    In my training and experience, I have learned that Verizon is a company

that provides cellular telephone access to the general public.  I also know that providers of

cellular telephone service have technical capabilities that allow them to collect and generate

information about the locations of the cellular telephones to which they provide service,

including cell site data, also known as "tower/face information" or "cell tower/sector records."

Cell site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas)

that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e.,

faces of the towers) to which the telephone connected.  These towers are often a half-mile or

more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore,

the tower closest to a wireless device does not necessarily serve every call made to or from that

device.  Accordingly, cell site data provides an approximate location of the cellular telephone but

is typically less precise than other types of location information, such as E-911 Phase II data or

Global Positioning Device ("GPS") data.

40.    Based on my training and experience, I know that Verizon can collect

historical cell site data about the SUBJECT PHONE.  I also know that wireless providers such as

Verizon typically collect and retain cell site data pertaining to cellular phones to which they

provide service in their normal course of business in order to use this information for various

business-related purposes.

41.    Based on my training and experience, I know that Verizon also collects

per-call measurement data, which is also referred to as the "Real-Time Tool" ("RTT"),

"Advanced Timing Data" and/or "Per Call Measurement Data" ("PCMD").  RTT, Advanced

16

Timing Data and PCMD data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell site data.

42.     Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the methods of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

43.     Location information for the SUBJECT PHONE will show where the SUBJECT PHONE traveled immediately after the robbery of the Store and over the following days. Because the SUBJECT PHONE is believed to belong to one of the perpetrators who entered the Store, it was likely in the possession of one of the perpetrators immediately after the robbery, and thus having this location information will provide investigators with additional information about the perpetrators' whereabouts and movements after the robbery. Having this information will help investigators to develop additional evidence of the locations and identities of the perpetrators.

## AUTHORIZATION REQUEST

44.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

45.     I further request that the Court direct Verizon to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Verizon, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

46.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, in particular, but not limited to RUTLEDGE, GOMEZ, and the Robber, whose identity is, to date, unknown.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation,

including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

Megan Quinn
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed and sworn to before me by telephone on April _____, 2023

Hon. Ramon E. Reyes, Jr. Digitally signed by Hon. Ramon E. Reyes, Jr.
Date: 2023.04.14 16:00:52 -04'00'

_____
HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

*Property to Be Searched*

This warrant applies to records and information associated with the cellular telephone assigned call number 646-941-0241 ("the SUBJECT PHONE"), that are stored at premises controlled by Verizon ("the Provider"), located in Bedminster, New Jersey.

## I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the SUBJECT PHONE listed in Attachment A for the time period from February 9, 2023 at 12:00 a.m. Eastern Time to February 12, 2023 at 12:00 a.m. Eastern Time:

a.   The following information about the customers or subscribers of the SUBJECT PHONE:

i.   Names (including subscriber names, user names, and screen names);

ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.   Local and long distance telephone connection records;

iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.   Length of service (including start date) and types of service utilized;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses (data sessions)); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions, as well as per-call measurement data (also known as the "real-time tool" or "RTT" data, "Advanced Timing Data," "Per Call Measurement" data and/or "PCMD").

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §§ 2, 924(c), and 1951(a) involving MICHAEL RUTLEDGE and the user of the SUBJECT PHONE during the period from February 9, 2023 at 12:00 a.m. to February 12, 2023 at 12:00 a.m.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

JRS
F. # 2023R00145

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 646-941-0241, STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | **<u>TO BE FILED UNDER SEAL</u>**<br><br>**Application for Non-Disclosure Order Pursuant to 18 U.S.C. § 2705(b)**<br><br>No. 23-MC-1003 |

**APPLICATION FOR ORDER COMMANDING VERIZON WIRELESS NOT TO NOTIFY ANY PERSON OF THE EXISTENCE OF WARRANT**

The United States requests that the Court order VERIZON WIRELESS not to notify any person (including the subscribers and customers of the accounts listed in the warrant) of the existence of the warrant attached to the proposed Order submitted herewith for the period of one year from the date of the Order.

VERIZON WIRELESS is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Pursuant to 18 U.S.C. § 2703, the United States obtained the attached warrant, which requires VERIZON WIRELESS to disclose certain records and information to the United States. This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." <u>Id</u>.

In this case, such an order would be appropriate because the attached warrant relates to an ongoing criminal investigation that is neither public nor known to the subjects of the investigation, and there is reason to believe that its disclosure will alert the the subjects to the ongoing investigation. Specifically, the accounts listed in the warrant are being used by individuals who are subjects of the investigation, who are at large and who do not yet know of the investigation. Accordingly, there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, or change patterns of behavior. <u>See</u> 18 U.S.C. § 2705(b). Some of the evidence in this investigation is stored electronically and can be completely and permanently erased. Some of the evidence in this investigation involves communications that can be transferred to alternate platforms (including encrypted platforms and platforms beyond the jurisdictional reach of U.S. legal process). If alerted to the existence of the warrant, there is reason to believe that the the subjects under investigation will destroy that evidence and change their patterns of behavior.

WHEREFORE, the United States respectfully requests that the Court grant the proposed Order directing VERIZON WIRELESS. not to disclose the existence or content of the warrant attached to the proposed Order for the period of one year from the date of the Order, except that VERIZON WIRELESS may disclose the warrant to an attorney for VERIZON WIRELESS for the purpose of receiving legal advice.

The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the subjects of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Dated: Brooklyn, New York
      April 14, 2023

                    BREON PEACE
                    United States Attorney
                    Eastern District of New York

By:                    
                    James R. Simmons
                    Assistant U.S. Attorney
                    (718) 254-7511